UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
                                                             :
ZESTY PAWS LLC,                                              :
                                      Plaintiff,             :
                                                             :            23 Civ. 10849 (LGS)
                                                             :
-against-                                                    :
                                                             :        OPINION & ORDER
NUTRAMAX LABORATORIES, INC., et al.,                         :
                                      Defendants.            :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

This false advertising action concerns a dispute over sales superiority claims for pet

supplement products.  Defendants and Counterclaim Plaintiffs Nutramax Laboratories, Inc. and

Nutramax Laboratories Veterinary Sciences, Inc. (collectively, "Nutramax") move for a

preliminary injunction seeking to enjoin Plaintiff and Counterclaim Defendant Zesty Paws LLC

("Zesty Paws") from continuing to advertise sales superiority claims under the Lanham Act,

15 U.S.C. § 1125(a), New York General Business Law § 349 and § 350-a, and New York

common law.  For the reasons below, Nutramax's preliminary injunction motion is granted.

I.      BACKGROUND

The following factual summary is taken from the parties' submissions on this motion,

including evidence presented at the evidentiary hearing.

A.      The Parties

Nutramax and Zesty Paws are direct competitors in the pet supplement market.  Both

companies sell pet supplement products that address a variety of conditions.  Zesty Paws'

products are intended to support pet health needs, including joint health (Mobility Bites),

behavioral health (Calming Bites), gut health (Probiotic Bites) and skin and coat health (Skin &

Coat Bites).  Nutramax's products are intended to support similar pet health needs, such as joint

health (Cosequin and Dasuquin), behavioral health (Solliquin), gut health (Proviable) and skin and coat health (Welactin).

**B.     The #1 Claims**

Beginning in or about July 2023, Zesty Paws began an advertising campaign claiming to be the #1 selling pet supplement brand in the United States.  Nutramax challenges Zesty Paws' sales superiority claims, specifically that Zesty Paws is (1) the "#1 Brand of Pet Supplements in the USA," (2) "USA's #1 Brand of Pet Supplements" and (3) the "#1 selling Pet Supplement Brand in the USA" (collectively, the "#1 Claims").  These claims were certified by Euromonitor, International Ltd. ("Euromonitor"), a market research company, after Zesty Paws engaged Euromonitor to determine whether Zesty Paws could make the claims.  Since July 2023, Zesty Paws has displayed the #1 Claims in various locations, including periodically on its website, on certain pages of its social media accounts, in a promotional video and on a number of in-store displays.

Zesty Paws has included source footnotes with the #1 Claims such as the following:

Source Euromonitor International Limited; Custom Research conducted June 2023, value sales for all retail channels, excluding vets.  Pet Supplements category as per Passport Ecommerce, online sales estimates based on 4,019,166 online shopper panelists in the USA for 2022 across 27 US online retailers selling pet dietary supplements.

According to Nutramax and undisputed by Zesty Paws, the U.S. pet supplement market is organized into three channels -- e-commerce (64%), veterinary (20%) and brick-and-mortar (17%) channels.  Nutramax and Zesty Paws have stipulated that, at all times relevant to the preliminary injunction motion, (1) the combined sales of Nutramax pet supplement products exceeded the combined sales of Zesty Paws pet supplement products and (2) the combined sales of Zesty Paws pet supplement products exceeded the combined sales of each individual pet supplement product sold by Nutramax, including Cosequin and Dasuquin.

### C.      Procedural Background

Zesty Paws commenced this action on December 13, 2023, seeking a declaration that the #1 Claims are not false or misleading under federal or state law.  On December 22, 2023, Nutramax filed an answer and counterclaims against Zesty Paws and third-party claims against Zesty Paws' parent company, Health and Happiness (H&H) US International Incorporated ("H&H").  Nutramax denied Zesty Paws' allegations and asserted various federal and state false advertising claims against Zesty Paws and H&H arising out of the #1 Claims.  The same day, Nutramax also filed a preliminary injunction motion against Zesty Paws, seeking to enjoin Zesty Paws during this action from using or displaying the #1 Claims in connection with the promotion, sale or distribution of Zesty Paws pet supplements.

On January 16, 2024, Nutramax filed a motion for a temporary restraining order ("TRO"), seeking to restrain Zesty Paws from using the #1 Claims in Costco stores.  On January 19, 2024, this Court heard oral argument on Nutramax's fully briefed TRO motion and made a preliminary finding that the #1 Claims are literally false.  The same day, a TRO was entered enjoining Zesty Paws from using the #1 Claims in any Costco stores beyond the twenty Costco stores in which Zesty Paws' products were already sold.  The order directed Nutramax to post a $25,000 bond.

The parties engaged in expedited discovery in anticipation of an evidentiary hearing on Nutramax's preliminary injunction motion.  At the hearing on April 16, 2024, Nutramax called three witnesses and introduced sixty-one exhibits.  Zesty Paws called four witnesses and introduced thirty-six new exhibits.  The witnesses included two expert witnesses per side.

For the present motion, the Court has considered an extensive record:  (a) the evidentiary record filed on the docket (declarations, expert reports and exhibits filed in connection with this motion and the TRO motion); (b) the testimony and exhibits admitted into evidence at the

evidentiary hearing and (c) the parties' oral and written arguments in connection with this motion and the TRO motion.  The Court also has accounted for the parties' objections to evidence and testimony, which ultimately go to their weight.

## II.    LEGAL STANDARD

"A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).[1]  The moving party need only show likelihood of success on the merits of at least one claim to warrant preliminary injunctive relief.  *N.Y. Pathological & X-Ray Lab'ys, Inc. v. Immigr. & Naturalization Serv.*, 523 F.2d 79, 82 (2d Cir. 1975); *accord Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 109 (S.D.N.Y. 2022).

"Courts refer to preliminary injunctions as prohibitory or mandatory.  Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *N. Am. Soccer League*, 883 F.3d at 36.  "Because mandatory injunctions disrupt the status quo," they are subject to "a heightened legal standard by showing a clear or substantial likelihood of success on the merits." *Id.* at 37.[2]  In deciding whether a preliminary injunction is mandatory or prohibitory, the Second Circuit has defined "status quo" as "the last actual, peaceable uncontested status which preceded the pending controversy." *Id.*  Here, the parties

---

[1] The Second Circuit has articulated two versions of this standard.  *Compare N. Am. Soccer League*, 883 F.3d at 37 (three-factor test), *with Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (four-factor test weighing balance of hardships separately from merits issues).  Any difference between these standards is immaterial here because Nutramax has shown that the balance of hardships tips in its favor.

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

appear to agree that the injunction is prohibitory and not mandatory.  The last peaceable status between the parties existed before the #1 Claims.  Because Nutramax's requested injunctive relief would not disrupt that status, the injunction is prohibitory, and Nutramax is not required to meet the heightened standard of showing a clear or substantial likelihood of success on the merits.

The heightened standard does not apply for the additional reason that the requested injunction can "be meaningfully undone in the event that the enjoined party prevails at trial on the merits."  *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (explaining that a plaintiff must also meet the heightened standard "if he seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits").  Zesty Paws can simply resume using its #1 Claims and recover monetary damages.

## III.   DISCUSSION

Nutramax is entitled to a preliminary injunction because Nutramax has demonstrated a likelihood of success on the merits of its federal false advertising claim, irreparable harm and that the balance of hardships and public interest weigh in favor of granting the injunction.

### A.   Likelihood of Success on the Merits

Nutramax has shown a likelihood of success on the four elements of a federal false advertising claim.  The Lanham Act prohibits the "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  "To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the

cause of actual or likely injury to the plaintiff." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48, 65 (2d Cir. 2016). The parties agree that the interstate commerce requirement is satisfied in this case.

### 1.    Literal Falsity

Nutramax has shown a likelihood of establishing the literal falsity of the #1 Claims. "A plaintiff may establish falsity in two different ways. To establish literal falsity, a plaintiff must show that the advertisement either makes an express statement that is false or a statement that is 'false by necessary implication,' meaning that the advertisement's 'words or images, considered in context, necessarily and unambiguously imply a false message.'" *Id.* "A message can only be literally false if it is unambiguous. If an advertising message is literally false, the 'court may enjoin the use of the message without reference to the advertisement's impact on the buying public.'" *Id.* "If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016).[3]

The parties' key dispute on this motion has been whether NUTRAMAX is a brand -- i.e., for the purpose of assessing whether ZESTY PAWS is the #1 U.S. pet supplements brand, whether NUTRAMAX as a whole or only each of Nutramax's individual product names (e.g., COSEQUIN) is a brand. The parties do not dispute that, if NUTRAMAX is a brand, Nutramax's total sales of pet supplement products exceed Zesty Paws' total sales of pet supplement products at all relevant times. But Zesty Paws argues that NUTRAMAX is not a brand, and that Zesty

---

[3] "If a message is not literally false, a plaintiff may nonetheless demonstrate that it is impliedly false if the message leaves an impression on the listener or viewer that conflicts with reality." *Church & Dwight Co.*, 843 F.3d at 65. The alternative theory of implied falsity is not reached because the finding of Nutramax's likelihood of showing literal falsity is sufficient to support the relief requested.

Paws' #1 Claims are true by comparing (1) the total sales of all of Zesty Paws' pet supplement products with (2) the sales of each individual pet supplement product sold by Nutramax.

Nutramax has shown a likelihood of establishing that NUTRAMAX is a brand.  The American Marketing Association and leading branding textbooks define a brand as "any distinctive feature like a name, term, design, or symbol that identifies goods or services." *Branding*, Am. Mktg. Ass'n, https://www.ama.org/topics/branding/ [https://perma.cc/RR44-GTC9].[4]  The Court found persuasive and credible the two Nutramax experts, Professor Peter Golder from the Dartmouth College Tuck School of Business and Professor Nathan Novemsky from the Yale School of Management, who testified that NUTRAMAX satisfies this definition because the Nutramax name differentiates Nutramax products from those of other sellers.  In concluding that the Nutramax name or logo serves as a source identifier, both experts reviewed the use of the Nutramax name on product packaging, the websites of major third-party retailers like Chewy.com and Amazon.com and the in-store displays of prominent third-party retailers like Costco.  The senior vice president and general manager of Nutramax Laboratories, Matt Garrett, testified that the federally registered Nutramax Laboratories trademark is physically on every product sold in the U.S.

Zesty Paws' arguments that NUTRAMAX is not a brand critique the strength of Nutramax's brand rather than assess whether NUTRAMAX is a brand at all.  Zesty Paws argues

---

[4] According to the Internet Archive's "Wayback Machine" service, which archives prior versions of webpages, the definition on the American Marketing Association website previously matched the one listed in the Novemsky Report and described by both Professors Novemsky and Golder at the hearing:  "A brand is a name, term, design, symbol or any other feature that identifies one seller's goods or service as distinct from those of other sellers."  As the current and previous definitions of "brand" are substantially similar, this change does not affect the analysis in this Opinion.  *See* Wayback Machine, Internet Archive, https://web.archive.org/web/20231007030627/https://www.ama.org/topics/branding/ (October 7, 2023, snapshot of https://www.ama.org/topics/branding/).

that NUTRAMAX is not a brand because it is not a "driver brand" and that consumers interpret the #1 Claims to mean that ZESTY PAWS is the #1 "driver brand" in the United States.  Zesty Paws' expert, Professor Jean-Pierre H. Dubé from the University of Chicago Booth School of Business, defines "driver brand" as "the brand name that plays the primary driver role in a consumer's purchase decision."  Zesty Paws' arguments are unavailing for several reasons.

First, the ordinary meaning of "brand" does not include the primary driver concept.  The dictionary definition of "brand" or "brand name" is "an arbitrarily adopted name that is given by a manufacturer or merchant to an article or service to distinguish it as produced or sold by that manufacturer or merchant and that may be used and protected as a trademark."  *Brand*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/brand [https://perma.cc/J5CK-7QUM] (linking to "brand name" in definition 4c); *Brand Name*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/brand%20name [https://perma.cc/9924-8PVH].  This definition aligns with the American Marketing Association definition, and neither definition requires that a brand play the primary driver role in a purchase decision.

Second, there is no evidence that consumers understand the #1 Claims to refer to a "driver brand," as Zesty Paws claims.  Zesty Paws has not cited any expert opinion, survey, academic literature or even anecdotal evidence that consumers understand "brand" within the #1 Claims to mean anything other than the ordinary meaning of "brand" described above.  "If an advertising message means something different from what reasonable consumers would understand it to mean, that message can be considered false."  *Church & Dwight Co.*, 843 F.3d at 66.

The survey conducted by Zesty Paws' expert Sarah Butler from NERA Economic Consulting falls short because it does not address how consumers interpret the #1 Claims or

whether consumers understand the #1 Claims to refer to a "driver brand."  Butler's survey is in contrast to the survey in *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 383-85 (2d Cir. 1986).  In *Avis*, the Second Circuit found that the claim "Hertz has more new cars than Avis has cars" was literally true based in part on a Hertz study that showed "about 87% of those interviewed understood 'that this ad concerned renting cars' . . . and that 'no one in this sample took that headline to refer to the word fleet . . . or total cars available by the companies.'"  *Id.* at 385.

Zesty Paws argues that the survey shows that NUTRAMAX is not a brand, but the survey is unpersuasive even for that proposition.  The survey respondents were shown an image of Nutramax's Cosequin product and asked to specify "the brand name of the product, any other names the product goes by, and the manufacturer of the product."  In response, "86.8 percent of respondents identified Cosequin® as the brand name of the product," and "10.1 percent of respondents indicated that Nutramax Labs was the brand of the product."  The main survey question asked, "Based on your review, what <u>brand</u> is this product?  ***(Please be as specific as possible.)***"  (Emphases in original).  As Professor Golder observed, the survey seems to evaluate less whether respondents generally perceive NUTRAMAX to be a brand in its own right and more whether respondents identify NUTRAMAX to be the most specific brand name of the particular Cosequin product package presented to respondents.  The survey's presentation of the Cosequin product lacked other branding cues a consumer might ordinarily see, such as the e-commerce listing from which the images were sourced and the bottle's tamper-evident seal, both of which reference Nutramax.  Even without these cues, 10.1 percent of respondents still identified NUTRAMAX as the brand for the Cosequin product.  Zesty Paws' own internal brand awareness studies from about 2020 through 2022 showed that NUTRAMAX frequently scored

higher than ZESTY PAWS when respondents were presented with a list of brands that included both names.

Next, Nutramax's internal documents concerning a possible move to a COSEQUIN-centered branding strategy do not support Zesty Paws' argument that NUTRAMAX is not a brand, because the strategy was never implemented.

Finally, the branding classifications by Euromonitor and Nielsen Consumer, LLC ("Nielsen"), another market research organization that aggregates sales data, do not support Zesty Paws' attempt to redefine "brand" as "driver brand" for multiple reasons. First, both companies assign only one "brand" per product. However, as Professor Novemsky explained in his declaration, "There can [be], and often are, several brands associated with a product, e.g., Frito Lay® Flamin' Hot® Cheetos®." In other words, that COSEQUIN is a brand does not mean that NUTRAMAX is not also a brand. Second, an email exchange from May 2023 shows that Zesty Paws suggested how Euromonitor should make the brand comparison, encouraging Euromonitor to reach out with any questions about "brand delineation" and stating, "As a reminder, please ensure all brands are evaluated at the consumer facing level (i.e. Dasuquin not Nutramax) . . . ." Third, Professor Novemsky testified that "[t]here is nothing [about] Nielsen's processes or motivations as a data seller that makes them an authority on what is and is not a brand." Indeed, Garrett testified that Nielsen's classifications can be inaccurate and inconsistent and provided several examples, including that Nielsen does not associate Nutramax with its Cosequin and Dasuquin products, but does associate Nutramax with its Welactin product. In addition, Nielsen tracks only a small segment of the pet supplements market. Nielsen does not track the e-commerce channel, the veterinary channel or Costco's retail sales, which together account for more than 85 percent of the market.

Because Nutramax has shown a likelihood of proving that NUTRAMAX is a brand, Nutramax is also likely to show that the #1 Claims are literally false -- i.e., that ZESTY PAWS is not the #1 U.S. pet supplement brand, based on the stipulated fact that Nutramax pet supplement sales are higher than Zesty Paws pet supplement sales.

### 2.     Materiality

Nutramax has shown a likelihood of establishing the materiality of the #1 Claims.  The Second Circuit "has defined materiality as 'likely to influence purchasing decisions.'"  *Apotex*, 823 F.3d at 63.  "While the materiality of the falsity and the likelihood of injury to the plaintiff resulting from the defendant's falsity are separate essential elements, in many cases the evidence and the findings by the court that a plaintiff has been injured or is likely to suffer injury will satisfy the materiality standard -- especially where the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff's."  *Church & Dwight Co.*, 843 F.3d at 70-71.  "If consumers, faced with the choice to purchase either the plaintiff's product or the defendant's, are likely to prefer the defendant's product by reason of the defendant's false advertising, the falsity of the defendant's advertising is material to the plaintiff's Lanham Act claim."  *Id.* at 71.

Nutramax has shown through both of its experts that the #1 Claims are likely to influence purchasing decisions because some consumers would likely prefer Zesty Paws' products as a result of the #1 Claims.  For example, Professor Novemsky testified that the effectiveness of various number one claims "has been studied for a long time by academic marketers and there is very consistent evidence that when you make a number one claim, you enhance the perceptions and the purchase of the claimed brand and you depress the perceptions and the purchase of the non-claimed brands."  He also testified that a number one claim in this case is "especially potent because . . . we don't actually get direct experience with these products and so we really have to

rely on these claims even more than [we] would with a product like Coke or Pepsi where we get to taste it for ourselves."  The evidence of likely injury to Nutramax discussed in the next paragraph further supports a finding of materiality.

      **3.**    **Cause of Injury**

Nutramax has shown a likelihood of establishing that the #1 Claims are the cause of actual or likely injury to Nutramax.  Professor Novemsky testified that the #1 Claims "would increase the sales of Zesty Paws and decrease the sales of any competitors, including Nutramax." Similarly, Professor Golder testified that the #1 Claims, "insofar as they're believed by consumers, will harm Nutramax, both in the short term and in the long term."  Professor Golder's report explains that "[t]he belief that Zesty Paws is the market leader will likely lead retailers to give Zesty Paws more shelf space, more prominent shelf positioning and overall increased availability of Zesty Paws products."

    **B.**    **Irreparable Harm**

Nutramax has carried its burden of showing irreparable harm in the absence of injunctive relief.  "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."  15 U.S.C. § 1116(a).  Because Nutramax has shown a likelihood of success on the merits of its false advertising claim, Nutramax is entitled to a presumption of irreparable harm under 15 U.S.C. § 1116(a).  Zesty Paws has not rebutted the presumption.

Zesty Paws argues that Nutramax's five-month delay in bringing its preliminary injunction motion rebuts a finding of irreparable harm.  This argument is unpersuasive because Nutramax first sent Zesty Paws a notice-of-dispute letter about the #1 Claims on July 17, 2023, shortly after learning of them.  The parties then continued to exchange letters until they

participated in an unsuccessful mediation on December 7, 2023.  Zesty Paws commenced this action on December 13, 2023, and Nutramax filed its preliminary injunction motion on December 22, 2023.  These circumstances do not support the inference that Nutramax's delay stemmed from its failure to perceive any harm from the #1 Claims.  *See, e.g.*, *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 Civ. 11045, 2020 WL 5758917, at *6 (S.D.N.Y. Sept. 28, 2020) (four-month delay did not rebut presumption of irreparable harm given settlement discussions); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333-34 (S.D.N.Y. 2011) (sixteen-month delay did not negate finding irreparable harm where parties had settlement discussions).

Zesty Paws' delay argument is also outweighed by the testimony of Nutramax's experts, which specifically addresses the irreparable nature of the expected harm from the #1 Claims. Professor Golder's research shows that once a brand's market leadership is lost, that loss is nearly always permanent along with the benefits brought by the market leadership position.  He identified goodwill as one of these benefits and explained, "[W]hat we find from the extensive literature is that consumers think more highly of number one brands, they perceive them to be higher quality, they are going to purchase them more frequently, [and] they're willing to pay more for those products because of that associated higher quality."  His report also explains that the power of signaling market leadership is so strong that even when consumers misperceive a brand as a market leader, the misperceived brand still accrues all of the benefits of market leadership, particularly higher evaluations from consumers.  Similarly, Professor Novemsky testified that lost market share is difficult to regain due to habit, status quo and brand loyalty: "Once someone buys a Zesty Paws product maybe once or maybe more than once, perhaps based on these number one claims, it is very hard to get them to switch away to a different product."  His report states that "if Zesty Paws is repeatedly making the #1 Claims, that claim will leave a

permanent mark on consumers' perceptions and purchasing behavior in the pet supplements category even if corrective actions are taken at a later date."

### C.      Balance of Hardship

The balance of hardship weighs in Nutramax's favor.  Nutramax submitted credible evidence that, without injunctive relief, Nutramax will continue to suffer substantial injury, including lost sales and irreparable damage to its goodwill.  Zesty Paws argued that it would be forced to recall its products that display the #1 Claims and remove the #1 Claims from its advertising materials, but it presented no evidence that the #1 Claims even appear on Zesty Paws' product packaging -- only on certain in-store displays.  Any harm from Zesty Paws' inability to make the #1 Claims is outweighed by the harm to Nutramax described above.

### D.      Public Interest

Finally, Nutramax has met its burden of showing that "the public interest would not be disserved by the grant of a preliminary injunction" because the public is not well served by purchasing decisions influenced by false advertising.  *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012); *see also N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 524 (S.D.N.Y. 2013).

## IV.    CONCLUSION

Based on the foregoing and having considered the parties' written submissions and the evidence presented at the April 16, 2024, hearing, Nutramax's preliminary injunction motion is **GRANTED**.  Zesty Paws is hereby preliminarily restrained and enjoined, pending the final determination of this action, as follows:

1.      For the purposes of this Preliminary Injunction Order, the following definitions shall apply:

a.  The "#1 Claims" shall mean the claims made by Zesty Paws that Zesty Paws

is (1) the "#1 Brand of Pet Supplements in the USA," (2) "USA's #1 Brand of

Pet Supplements" and (3) the "#1 selling Pet Supplement Brand in the US"

and any substantially identical claim.

b.  The "Market" shall mean the United States.

c.  "Advertisement" shall mean any advertisement, flyer, brochure, billboard,

display, television commercial, radio commercial, Internet commercial or

similar communication of marketing, advertising, sale or promotional

information or materials directed to the general public or segments of the

general public.

2.      Zesty Paws shall not publish, disseminate or distribute, or cause to be published,

disseminated or distributed, the #1 Claims in any form or fashion in the Market -- including in

any Costco stores -- in connection with the marketing, promotion, sale, or distribution of ZESTY

PAWS brand pet supplements.

3.      This Order is binding upon Zesty Paws and its parents, subsidiaries, officers,

agents, servants, and employees, and all other persons in active concert or participation with any

of them with regard to the #1 Claims who receive actual notice of this Order.  Zesty Paws shall

provide such actual notice within fourteen calendar days of the Effective Date (as defined below)

of this Order.

4.      Nutramax shall post a bond in the amount of $50,000 (the "Bond"), in addition to

the $25,000 Nutramax already posted for the TRO, as soon as reasonably practicable after entry

of this Order, but in any event no later than fourteen calendar days of this Order.

5.      This Order shall take effect upon the posting of the Bond ("Effective Date") and

shall remain in effect until further order of this Court.  Per the terms of the previously entered

TRO, that order is no longer in effect upon the Effective Date of this Preliminary Injunction Order.

      6.     Zesty Paws shall comply with this Order within fourteen calendar days of its Effective Date.

      7.     Within fifteen calendar days of the Effective Date of this Order, Zesty Paws shall file a report with the Court, setting forth in detail the manner in which Zesty Paws has complied with this Order.

      The parties may jointly propose any modification to this Order, but only to the extent that the affected parties on both sides agree.

      The Clerk of Court is respectfully directed to close the motion at Dkt. 10.

Dated: June 4, 2024
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**