UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------------X
                                      :

HEALTH AND HAPPINESS (H&H) US
LLC,

           Plaintiff/Counterclaim Defendant,

              - against -

NUTRAMAX LABORATORIES, INC. and
NUTRAMAX LABORATORIES
VETERINARY SCIENCES, INC.,

          Defendants/Counterclaim Plaintiffs.
-------------------------------------------------------------------------------------X

23 Civ. 10849 (LGS) (GS)

OPINION & ORDER

**GARY STEIN, United States Magistrate Judge:**

Defendants/Counterclaim Plaintiffs Nutramax Laboratories, Inc. and

Nutramax Laboratories Veterinary Sciences, Inc. ("Nutramax") seek sanctions

against Plaintiff/Counterclaim Defendant Health and Happiness (H&H) US LLC

(f/k/a Zesty Paws LLC) ("Zesty Paws") pursuant to Fed. R. Civ. P. 37(e)(2) and Fed.

R. Civ. P. 37(c)(1). (Dkt. No. 310). For the reasons set forth below, Nutramax's

motion is **DENIED**.

## BACKGROUND

This is a false advertising case between direct competitors in the pet

supplement market. At the heart of the dispute is an advertising campaign

initiated by Zesty Paws in July 2023 featuring claims that it sells the #1 brand of

pet supplements in the United States (the "#1 Claims"). Nutramax contends that

these claims were false because the combined sales of Nutramax's pet supplement

products exceeded those for Zesty Paws' products. Zesty Paws commenced this

1

action in December 2023, seeking a declaratory judgment that the #1 Claims are not false or misleading under federal or state law.  (Dkt. No. 1 ("Compl.")). Nutramax asserted counterclaims under the Lanham Act, the New York General Business Law, and New York common law, seeking injunctive relief and damages. (Dkt. No. 11).  *See Zesty Paws LLC v. Nutramax Labs., Inc.*, 157 F.4th 194, 196 (2d Cir. 2025).

Nutramax served its initial requests for document production on February 5, 2024, calling for Zesty Paws to produce, *inter alia*, documents concerning its use and distribution of #1 Claims.  (*See* Declaration of Jason D. Rosenberg, Dkt. No. 314 ("Rosenberg Decl.") Ex. 2).  As relevant here, Nutramax requested that Zesty Paws produce:

- Copies of any marketing, advertising, or promotional materials (physical or electronic) including (but not limited to) any presentation, literature, handout, trade show material, product packaging, press release, point-of-sale display, podcast, PowerPoint, brochure, magazine advertisement, social media post or advertisement, mailing, or webpage (including both Zesty Paws and third-party retailer webpages) featuring the #1 Claims"; [and]

- Documents sufficient to show, for each unique item of advertising, marketing, or promotional material [of the #1 Claims], the number of consumers who viewed the material or were exposed to the material, along with any other viewer data associated with the item (e.g., demographic data, geographic data, etc.).

(*Id.* (First Requests for Production Nos. 4, 5)).

In a February 22, 2024 meet and confer, Zesty Paws withdrew its prior objections to Nutramax's requests and agreed that it would produce responsive documents, including those in the "public domain."  (*See* Declaration of Mary

Gallagher, Dkt. No. 315 ("Gallager Decl.") ¶ 4; *see also* Dkt. No. 241 at 2). Zesty Paws also agreed to withdraw its relevance objections to Request No. 5 (the second bulleted request above). (Gallagher Decl. ¶ 5).

As discovery got underway, the parties were also litigating a preliminary injunction motion filed by Nutramax seeking to prevent Zesty Paws from making #1 Claims. (*See* Dkt. No. 10). On June 4, 2024, the Honorable Lorna G. Schofield granted Nutramax's motion and issued a preliminary injunction ordering, in relevant part, that "Zesty Paws shall not publish, disseminate, or distribute, or cause to be published, disseminated or distributed, the #1 Claims in any form or fashion" in connection with the marketing, promotion, sale, or distribution of its pet supplements in the United States. (Dkt. 135 ("Preliminary Injunction Order" or "Order") at 15). The Preliminary Injunction Order directed Zesty Paws to "comply with this Order within fourteen calendar days" of the effective date of the Order. (*Id.* at 16). The Order also directed Zesty Paws to file a report with the Court detailing the manner in which Zesty Paws complied with the Order. (*Id.*).[1]

Zesty Paws proceeded to undertake efforts to comply with the Preliminary Injunction Order. On June 18, 2024, Zesty Paws filed on the docket, pursuant to the Order, a report entitled "Notice of Compliance with Preliminary Injunction." (Dkt. No. 137 ("Notice of Compliance")). The Notice of Compliance stated, in relevant part, that Zesty Paws:

---

[1] On October 3, 2025, the Second Circuit reversed the Preliminary Injunction Order, finding that the district court had applied an incorrect standard for determining whether the #1 Claims were literally false. *Zesty Paws*, 157 F.4th at 198-99.

- Directed its "public relations and social media, direct to consumer and ecommerce marketing, growth marketing, and sales" teams to "cease use of all #1 Claims and remove the #1 Claims from all items that are consumer or customer facing, and from all websites, platforms, banners, marketing materials and planning documents."

- "[C]onfirmed removal of the #1 Claims" from:
    - Zesty Paws' social media platforms (Facebook, Instagram, Tiktok, Twitter, YouTube, and LinkedIn);
    - H&H's social media platforms (Facebook, Instagram, Tiktok, Twitter, YouTube, and LinkedIn);
    - Zesty Paws' press media, printed materials, and displays in development;
    - Zesty Paws' printed in-store materials;
    - zestypaws.com, including all linked webpages;
    - Zesty Paws' Amazon store and product pages; and
    - Paid digital advertising, including influencers.

- "[D]iscontinued use of the #1 Claims on all ecommerce platforms and instructed ecommerce platforms to remove any advertising bearing the #1 Claims."

- "[R]emoved depictions of the #1 Claims from brand folders containing authorized images for promotional or marketing activities."

(Notice of Compliance ¶¶ 1, 3, and 4).

Nutramax soon discovered that Zesty Paws' compliance with the Preliminary Injunction Order was less than complete. Within a week of the Notice of Compliance, Nutramax's counsel notified Zesty Paws' counsel that "our review of Zesty Paws' Amazon product pages and certain social media accounts revealed that Zesty Paws has failed to fully comply with the Order," attaching a list of URLs from Amazon's website and Zesty Paws' Facebook and LinkedIn pages "where the #1 Claims can still be found." (Declaration of Kevin Jakopchek, Dkt. No. 326 ("Jakopchek Decl.") Ex. B). Nutramax asked that Zesty Paws cease these uses

4

promptly, and the following week, Zesty Paws confirmed that the references "have all been removed." (*Id.* Exs. B &C).

Nutramax subsequently discovered another #1 Claim usage on Zesty Paws' Facebook page that Zesty Paws had omitted to remove. (*See* Jakopchek Decl. ¶ 3). Nutramax raised this issue during a Rule 30(b)(6) deposition of a Zesty Paws witness on November 22, 2025. (*Id.*). At Nutramax's request, Zesty Paws refrained from removing the claim from the Facebook page while it awaited a response from Nutramax as to "what if any preservation steps [Nutramax] may request;" Nutramax subsequently authorized removal of the claim without requesting that Zesty Paws take any preservation steps. (*Id.* Ex. A (email correspondence between counsel for Nutramax and counsel for Zesty Paws from November 22, 2024 through December 17, 2024)).

In the meantime, in reviewing Zesty Paws' discovery production, Nutramax noticed that Zesty Paws had not produced copies or examples of several advertisements containing #1 Claims, including from Zesty Paws' product listings on Amazon and Target.com, from Zesty Paws' own website, from a variety of social media posts, and from physical retail stores. Nutramax also believed that Zesty Paws had failed to produce information regarding the viewership, reach, or impressions for these advertisements (which the parties refer to as "engagement data" or "customer metrics"). Nutramax raised these concerns in a deficiency letter sent to Zesty Paws on November 7, 2024, a week before fact discovery closed on November 15, 2024. (Declaration of Jason D. Rosenberg, Dkt. No. 314 ("Rosenberg

Decl.") Ex. 6 at 1-2); *see* Dkt. No. 218 at 2).  Over the next two months, Zesty Paws' counsel undertook efforts to recover these materials and identify and produce other requested materials.  (Declaration of Carl Joseph Bacon, Dkt. No. 324 ("Bacon Decl.") ¶ 9; *see also* Rosenberg Decl. Exs. 7 & 8 (follow up emails and letters from Nutramax)).

On January 14, 2025, Nutramax requested a conference with the Court in anticipation of filing a motion to compel discovery, raising its concerns with Zesty Paws' production and questioning whether Zesty Paws had conducted a reasonable search for responsive documents.  (Dkt. No. 241).  Nutramax provided examples of instances in which it had "uncovered uses of the #1 Claims that Zesty Paws had not produced or identified in discovery." (*Id.* at 2).  It sought, *inter alia*, an order requiring Zesty Paws to supplement its production to show "each instance where the #1 Claims were used and distributed" or, if it does not have these materials, provide "an explanation as to why." (*Id.* at 1-2).

Zesty Paws opposed Nutramax's request in a January 17, 2025 letter.  (Dkt. No. 245).  It maintained that Nutramax's demand for "each instance" of the use of the #1 Claims was "contrary to Rule 26(b)'s proportionality requirement," and that it had "produced thousands of documents regarding the creation, support, use, and dissemination of the #1 Claims." (*Id.* at 2).  As for instances of # 1 Claims for which Zesty Paws had not produced copies, Zesty Paws noted that "all such examples have been removed as a result of its good faith efforts to comply with" the Preliminary Injunction Order and asserted that the "production of screen captures of such

materials would have no material impact on the merits of this case even if Zesty Paws could somehow find them." (*Id.* at 3).  Additionally, Zesty Paws represented that "to the extent Nutramax is not already in possession of such screen captures, Zesty Paws' production of all #1 Claims content from the 'Brandfolder' includes copies of nearly all of the #1 Claims artwork and videos it used on Amazon, YouTube, and elsewhere." (*Id.* at 3).

The Court conducted a discovery conference on March 18, 2025 to address these issues.  At the conference, the Court put in place a process for Nutramax to provide Zesty Paws with a list of specific requests for supplemental discovery and for the parties to then meet and confer about those requests and return to the Court if necessary.  (Transcript of March 18, 2025 Conference, Dkt. No. 264 ("March 18 Tr.") at 43:21-44:10; *see also* Dkt. No. 266).  Towards the end of the conference, Zesty Paws' counsel made explicit what its January 17 letter implied: that Zesty Paws had not preserved images of pages it had removed as part of its efforts to comply with the Preliminary Injunction Order.  (*Id.* at 41:7-25).  Nutramax's counsel immediately interjected that "that seems like a concession that that evidence was spoliated." (*Id.* 42:2-9).  The Court refrained from commenting on that claim at that time.  (*Id.* 42:16-17).

Nutramax subsequently provided Zesty Paws with its specific requests.  (Dkt. No. 266).  Zesty Paws then conducted additional searches, re-reviewed its archived social media content, reviewed documents previously marked non-responsive, and conducted further investigation and searches regarding use of the #1 Claims.

(Bacon Decl. ¶¶ 11-12). On May 2, 2025, Zesty Paws made a supplemental production. (*See* Dkt. No. 289 at 5-6; Bacon Decl. ¶ 13). This production was substantial, representing approximately one-third of all documents produced by Zesty Paws in this case. (Gallagher Dec. ¶ 7). It included additional #1 Claim materials that Zesty Paws identified through its supplemental searches in response to Nutramax's requests. (Rosenberg Decl. Ex. 17). Much of this material, in Nutramax's view, should have been produced in response to Nutramax's initial requests for production. (*See* Dkt. No. 291 at 3).

In all, Zesty Paws has produced 7,034 documents in this case, including thousands of documents regarding the #1 Claims. (Bacon Decl. ¶¶ 3, 5). In addition, Zesty Paws' marketing agency produced more than 5,500 documents to Nutramax pursuant to a third-party subpoena. (*Id.* ¶ 7). The documents produced by Zesty Paws include, *inter alia*, documents reflecting #1 Claims on online retailer websites, at physical retail locations, in social media posts, on Zesty Paws' own website, and in presentations to retailers, email blasts, and press releases. (*Id.* ¶ 5). Zesty Paws also produced all the artwork featuring the #1 Claims saved to its internal "Brandfolder" repository. (*Id.* ¶ 5.i).

However, as Zesty Paws acknowledged in its cover email accompanying its May 2 production, Zesty Paws was unable to produce or recover materials removed in compliance with the Preliminary Injunction Order. (Rosenberg Decl., Ex. 17). Specifically, Zesty Paws has determined it "did not produce and [has] not been able to recover" the following:

- 15 social media posts from Zesty Paws' Facebook, YouTube, TikTok, Instagram, and/or LinkedIn accounts, including the limited engagement data connected to each post, such as the "likes" and "comments" and other engagement data connected to each post;

- approximately 9 Zesty Paws sponsored advertisements with the #1 Claims that were displayed on Facebook and/or Instagram and any engagement data that would have been connected to such advertisements;

- an image from Zesty Paws' Amazon product pages; and

- a video from Zesty Paws' Target.com product pages.

(Bacon Decl. ¶ 14).

On May 23, 2025, Nutramax moved for a conference regarding its anticipated motion for discovery sanctions based on Zesty Paws' purported spoliation of evidence and withholding of documents responsive to Nutramax's initial requests for production. (Dkt. No. 291). Nutramax sought sanctions in the form of (i) a mandatory presumption that every consumer's purchase of Zesty Paws pet supplement products from the date Zesty Paws first published its #1 Claims in July 2023 to the present was caused by the #1 Claims and (ii) Nutramax's attorneys' fees and expenses incurred in litigating Zesty Paws' alleged spoliation of evidence. (*Id.* at 2). Nutramax also sought sanctions for Zesty Paws' alleged withholding of documents until its May 2 supplemental production or, at least, new depositions of Zesty Paws witnesses. (*Id.* at 3).

Zesty Paws responded on May 29, 2025, denying that any sanctions were warranted. (Dkt. No. 292). While Zesty Paws disagreed that the removed #1 Claims materially impacted Nutramax, it offered to enter into stipulations to

resolve Nutramax's concerns.  Specifically, Zesty Paws offered to stipulate that (i) #1 Claims were displayed on every Zesty Paws product description page on Amazon's and Target's websites from July 2023 to June 2024; and (ii) copies of the #1 Claims that Nutramax had made from social media posts were authentic.  (*Id.* at 2).  Zesty Paws had proposed these stipulations prior to Nutramax's filing of its May 23, 2025 letter, but Nutramax declined and instead sought a stipulation to the same effect as the mandatory presumption sought in its letter.  (*Id.*).

On July 22, 2025 the Court held a conference on Nutramax's request.  (*See* Transcript of July 22, 2025 Conference, Dkt. No. 308 ("July 22 Tr.")).  During the conference, the Court granted Nutramax's request for full briefing on its motion for sanctions based on Zesty Paws' alleged spoliation.  (*Id.* at 3:13-16, 17:1-24; *see* Dkt. No. 291 at 3).  With respect to Zesty Paws' alleged withholding of documents, the parties agreed to meet and confer regarding Zesty Paws' proposal to cure any prejudice by making witnesses available to be deposed (or re-deposed) about documents first produced as part of Zesty Paws' May 2 supplemental production. (July 22 Tr. at 23:25-26:3, 30:8-11).[2]

Nutramax filed its motion for discovery sanctions on August 19, 2025 (Dkt. No. 310), supported by a memorandum of law (Dkt. No. 312 ("Mot.")) and declarations from two of its attorneys, Jason D. Rosenberg (Dkt. No. 314 ("Rosenberg Decl.") and Mary Gallagher (Dkt. No. 315 ("Gallager Decl."), and a declaration from Jeffery Stec, its damages expert (Dkt. No. 317 ("Stec Decl.")), along

---

[2] Zesty Paws represented that it had made such an offer to Nutramax before Nutramax filed its letter motion for sanctions.  (*Id.* at 25:25).

with attached exhibits.  Nutramax seeks sanctions under both Rule 37(e)(2) and Rule 37(c)(1) of the Federal Rule of Civil Procedure.  (Dkt. No. 310).

Zesty Paws filed its opposition brief on September 16, 2025 (Dkt. No. 329 ("Opp.")), along with declarations and attached exhibits from Brian Cole (Dkt. No. 320 ("Cole Decl.")), its Chief Customer Officer and Vice President of Sales; Maria F. De Alba-Williams, its Director of Marketing Growth (Dkt. No. 321 ("Alba Decl.")); Blake Inglish (Dkt. No. 322 ("Inglish Decl.")), its expert witness on damages; Patrick O'Neil (Dkt. No. 323 ("O'Neill Decl.")), its Amazon Brand Manager; Paris Miller (Dkt. No. 327 ("Miller Decl.")), its E-commerce Account Manager; Ryan Norton (Dkt. No. 328 ("Norton Decl.")), its Senior Director of National Accounts; Sales; and Carl Joseph Bacon (Dkt. No. 324 ("Bacon Decl.")) and Kevin Jakopchek (Dkt. No. 326 ("Jakopchek Decl.")), two of its attorneys in this action.

After receiving Zesty Paws' opposition papers, Nutramax filed a letter motion seeking to depose three of the Zesty Paws employees who submitted declarations, as well as an extension of time for filing its reply brief.  (Dkt. No. 330).  Zesty Paws opposed Nutramax's application.  (Dkt. No. 331).  The Court denied Nutramax's request for depositions, finding that Nutramax had failed to establish good cause therefor.  (Dkt. No. 333).  Nutramax filed its reply brief on October 8, 2025 (Dkt. No. 338 ("Rep.")), along with a second declaration from Jeffery Stec (Dkt. No. 339 ("Stec Rep. Decl.")).

## LEGAL STANDARDS

"A district court has broad discretion to determine the appropriate sanctions for discovery abuses under both Rule 37 of the Federal Rules of Civil Procedure and its inherent powers." *Ryan v. Rock Grp., NY. Corp.*, No. 18 Civ. 2600 (GHW), 2019 WL 6841874, at *3 (S.D.N.Y. Dec. 16, 2019) (citing *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009)).

### A.  Sanctions Under Rule 37(e)

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  A district court has the inherent authority to impose sanctions on a party for spoliation, but when the lost evidence consists of electronically stored information ("ESI"), the sanctions analysis is governed by Rule 37(e).  *See Barbera v. Grailed, LLC*, No. 24 Civ. 3535 (LJL), 2025 WL 2098635, at *10 (S.D.N.Y. July 25, 2025) ("Rule 37(e) 'forecloses reliance on inherent authority or state law to determine when certain measures should be used' in ESI spoliation cases." (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment)).[3]

---

[3] Neither party here contends that the allegedly spoliated evidence is not electronically stored information or argues for a sanctions standard different from the one set forth in Rule 37(e).  *See Stanbro v. Westchester County Health Care Corp.*, Nos. 19 Civ. 10857, 20 Civ. 1591 (KMK) (JCM), 2021 WL 3863396, at *10 (S.D.N.Y. Aug. 27, 2021) ("'ESI includes e-mails, webpages, word processing files, and databases stored in the memory of computers, magnetic disks (such as computer hard drives and floppy disks), optical disks (such as DVDs and CDs), and flash memory (such as 'thumb' or 'flash' drives).'" (quoting BARBARA J. ROTHSTEIN, RONALD J. HEDGES & ELIZABETH C. WIGGINS, FED. JUD. CTR., MANAGING DISCOVERY OF ELECTRONIC INFORMATION: A POCKET GUIDE FOR JUDGES at 2, (2007), https://www.uscourts.gov/sites/default/files/eldscpkt_1.pdf) (emphasis omitted)).

Rule 37(e) provides that a court may impose sanctions when "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e). Courts in the Second Circuit apply a three-part test to determine the propriety of sanctions under Rule 37(e):

> The first is to decide if the rule applies at all—that is, if a party failed to take reasonable steps to preserve electronically stored information that should have been preserved in the anticipation or conduct of litigation.  If so, then the second step is to decide if there has been prejudice to another party from loss of the information, in which case the Court may order measures no greater than necessary to cure the prejudice.  Lastly, the third step to consider—regardless of prejudice to any other party—is whether the destroying party acted with the intent to deprive another party of the information's use in the litigation, in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.

*Karsch v. Blink Health Ltd.*, No. 17 Civ. 3880 (VM) (BCM), 2019 WL 2708125, at *13 (S.D.N.Y. June 20, 2019) (citations omitted).

"[T]he imposition of a sanction under Rule 37(e)(2) requires a finding of 'intent to deprive another party of the information's use in the litigation.'"  *Hoffer v. Tellone*, 128 F.4th 433, 438 (2d Cir. 2025) (quoting Fed. R. Civ. P. 37(e)(2)) (holding that the plain language of Rule 37(e)(2), as amended in 2015, "abrogated the lesser 'culpable state of mind' standard" previously used in the context of lost ESI).  "A party's acting negligently or knowingly will not suffice to justify the sanctions enumerated in Rule 37(e)(2)."  *Id.*  "It is the movant's burden to demonstrate that the spoliating party acted with the intent to deprive, not merely the intent to

13

destroy." *Doubleline Cap. LP v. Odebrecht Fin., Ltd.,* No. 17 Civ. 4576 (GHW) (BCM), 2021 WL 1191527, at *8 (S.D.N.Y. Mar. 30, 2021) (citation omitted).

A party seeking sanctions under Rule 37(e)(2) must establish the requisite elements, including the intent-to-deprive element, by a preponderance of the evidence. *See Hoffer*, 128 F.4th at 440. "'[S]peculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 497 (S.D.N.Y. 2022) (quoting *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014)). "No matter how inadequate a party's efforts at preservation may be, . . . sanctions are not warranted unless there is proof that some information of significance has actually been lost." *Orbit One Commn's, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 431 (S.D.N.Y. 2010).

"The sanctions permitted under Rule 37(e)(2)—after a finding of 'intent to deprive' has been made—are particularly harsh, and . . . '[c]ourts should exercise caution' in using them." *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15 Civ. 9363 (ALC) (DF), 2018 WL 1512055, at *8 (S.D.N.Y. Mar. 12, 2018) (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). An instruction to the jury that it should presume lost evidence to be unfavorable to the party that destroyed the evidence "has long been considered an 'extreme' sanction that 'should not be given lightly.'" *Id.* (quoting *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 219-20 (S.D.N.Y. 2003)).

14

"[I]n addition to any other sanctions imposed under Rule 37(e), 'a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation.'" *In re Keurig*, 341 F.R.D. at 498 (quoting *Lokai Holdings*, 2018 WL 1512055, at *9).

## B.  Sanctions Under Rule 37(c)(1)

Rule 37(c)(1) provides that, where a party fails to provide information as required by Rule 26(a) or (e), it may be precluded from using that information at trial or otherwise, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "In addition to or instead of this sanction," the court "may order payment of the reasonable expenses, including attorney's fees, caused by the failure[.]" Fed. R. Civ. P. 37(c)(1)(A).

Courts in the Second Circuit analyze three factors in determining whether to impose sanctions under Rule 37(c)(1):

> (1) whether the party with control of the evidence 'had an obligation to timely produce it,' (2) whether that party had a 'culpable state of mind,' and (3) whether the withheld documents are 'relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'

*Au New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411 (GHW), 2023 WL 2612204, at *9 (S.D.N.Y. Mar. 23, 2023) (quoting *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007)).

"To satisfy the first element of this test, the moving party must show that the respondent breached its obligations, either as set forth in Rule 26, Fed. R. Civ. P., or as provided in court orders regulating discovery. The 'culpable state of mind' element is satisfied by a showing that a party has breached a discovery obligation

15

through bad faith or gross negligence or ordinary negligence.  With respect to the third element, a finding that a party breached its discovery obligations in bad faith is sufficient to establish the relevance of untimely produced or destroyed evidence as a matter of law; a finding that a party breached its obligations through gross negligence is frequently sufficient." *Id.* (quoting *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125 (cleaned up)).  It is the movant's burden to demonstrate that sanctions are warranted under Rule 37(c)(1).  *Dusablon v. Gibbs*, No. 23 Civ. 5843 (JGLC), 2025 WL 3527090, at *5 (S.D.N.Y. Dec. 9, 2025).

Sanctions are not available if the failure to produce was "substantially justified or is harmless."  Fed R. Civ. P. 37(c)(1).  "A failure is substantially justified if the movant 'could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'"  *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, No. 15 Civ. 4244 (JGK) (OTW), 2020 WL 433479, at *2 (S.D.N.Y. Jan. 28, 2020) (quoting *Henrietta D. v. Guiliani*, No. 95 Civ. 641 (SJ), 2001 WL 1602114, at *5 (E.D.N.Y. Dec. 11, 2001)).  "A failure is harmless if there is an 'absence of prejudice to the [movant].'"  *Id.* (quoting *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012)).  The burden of showing substantial justification or harmlessness is on the party that failed to produce the documents.  *Id.*

16

## DISCUSSION

### A. Nutramax's Request for Spoliation Sanctions Under Rule 37(e)

Nutramax moves for sanctions under Fed. R. Civ. P. 37(e)(2) on the basis of Zesty Paws' failure to preserve #1 Claim documentation.  Nutramax seeks an adverse inference "that every consumer's purchase of Zesty Paws pet supplement products from the date Zesty Paws first published the #1 Claims (July 10, 2023) to the present was caused by the #1 Claims." (Mot. at 25).  Nutramax contends that Zesty Paws spoliated two broad categories of evidence: "(a) materials demonstrating how Zesty Paws used #1 Claims in its key sales channels (like Amazon, which comprises the bulk of Zesty Paws' sales); and (b) customer metrics (*e.g.*, clicks, impressions, conversion rates, and engagement) that would have established whether sales in those channels were attributable to the #1 Claims." (*Id.* at 1-2).

Zesty Paws does not dispute that it failed to preserve documentation of #1 Claims removed in compliance with the Preliminary Injunction Order.  (Mot. at 3; Opp. at 3).  The parties do, however, dispute the scope of the #1 Claims images lost. (*Compare* Mot. at 1 *with* Opp. at 6).  In addition, Zesty Paws contends that it has not lost any engagement data/customer metrics from online retailers, that it generally did not control or possess the engagement data specific to the use of #1 Claims sought, or that such data did not exist, and that Nutramax's contentions regarding the spoliation of engagement data are entirely speculative.  (Opp. at 7-8). Before applying the three-part test for determining whether sanctions are

17

warranted for Zesty Paws' loss of relevant information, the Court first defines the universe of what was lost.

### 1.  The Scope of the Lost Information

In its motion, Nutramax accuses Zesty Paws of spoliating "data analytics from a range of sales channels," showing viewership and impressions related to the # 1 Claims, which "is crucial to determining the full extent by which Zesty Paws' #1 Claims campaign harmed Nutramax." (Mot. at 14-15, *see also* Mot. at 1, 6).  In support, Nutramax relies on the observations of its damages expert, Dr. Stec, that "Zesty Paws should have had access to a range of metrics for its product pages, such as 'clicks and impressions, conversion rates, and query and search engagement performance.'" (*Id.* at 6 n.2 (citing Stec Decl. ¶¶ 13-15)).

Nutramax, however, has failed to substantiate this charge, and Zesty Paws' opposition papers convincingly refute it.  Declarations from Zesty Paws witnesses establish that in complying with the Preliminary Injunction Order, Zesty Paws removed only images of the #1 Claims from online retailers, not engagement data or customer metrics related to use of those Claims.  These witnesses affirm that, to the extent such data exists, Zesty Paws produced it.  (*See* O'Neill Decl. ¶¶ 6-9 (Amazon); Norton Decl. ¶¶ 7-10 (Target and Walmart); Miller Decl. ¶ 7 (Chewy); *see also* Opp. at 7-8).

For example, with respect to Amazon, Zesty Paws explains that when it changes the content on an Amazon page, the data associated with the page "remains available and unchanged." (O'Neill Decl. ¶ 8).  As a result, "removal of the

18

#1 Claims from Amazon resulted solely in removal of the #1 Claims themselves and not any engagement data." (*Id.*). Further, "Zesty Paws has never had—and never deleted—any engagement data from Amazon that would show how many Amazon visitors viewed, clicked on, or in any[]way interacted with the #1 Claims Zesty Paws posted on its Amazon product pages." (*Id.* ¶ 6). To the extent Zesty Paws used "DSP advertisements" on Amazon promoting the #1 Claims (*i.e.*, video, audio, or display ads), engagement metrics do exist, were provided by Amazon to Zesty Paws, and produced to Nutramax. (*See id.* ¶ 9).

In reply, although criticizing Zesty Paws for producing the Amazon DSP engagement data late, Nutramax offers no meaningful rebuttal of Zesty Paws' evidentiary showing that no engagement data from Amazon or other online retailers was lost. (*See* Rep. at 3-4). For example, it presents no statements from Amazon or any other retailer contradicting Zesty Paws' sworn representations. To the extent Nutramax still affirmatively contends that Zesty Paws spoliated engagement data, it has offered only speculation that this is the case, which is insufficient. *See In re Keurig*, 341 F.R.D. at 497 ("speculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence" (citation omitted)). Accordingly, the Court considers only the loss of images or documentation of the #1 Claims themselves in considering Nutramax's Rule 37(e)(2) sanctions motion.[4]

---

[4] Nutramax's reply brief claims that Zesty Paws has committed "even more sanctionable conduct" by not producing Amazon engagement data referred to in the declaration of Patrick O'Neill, Zesty Paws' Amazon Brand Manager. (Rep. at 4). O'Neill's declaration describes "product page engagement reports" that are available from Amazon "upon request," and states that such reports are "still

As for the #1 Claims themselves, Nutramax contends that "large swaths" of #1 Claims documentation were spoliated, beyond the 26 website advertisements, social media posts, and other images identified by Zesty Paws, and that there is a "wealth of spoliated information that Nutramax will never see." (Mot. at 1, 22-23; *see* Opp. at 5). Zesty Paws asserts, by contrast, that the materials it has identified represent "the entire universe of responsive materials that were removed and not preserved," and that there is no evidence of anything beyond these materials. (Opp. at 5-6).

Here, too, Nutramax does not muster adequate support for its claim. Nutramax points out that the instances of removed #1 Claims identified by Zesty Paws comprise only a portion of the sites as to which Zesty Paws "confirmed removal" of the #1 Claims in its Notice of Compliance. (Mot. at 5). Zesty Paws explains, however, that that representation encompassed sites as to which #1 Claims had never appeared, such as an inactive Facebook account that has no posts later than 2019, and other sources that do not even exist. (*See* Alba Decl. ¶ 9; *see also* Opp. at 8-9). According to the marketing director who signed the Notice of

---

available today." (O'Neill Decl. ¶ 6). As such reports apparently still exist and have not been deleted (at least not by Zesty Paws), they do not support Nutramax's request for spoliation sanctions. Nutramax recognizes as much but nonetheless asks the Court to award sanctions under the Court's inherent authority (rather than under Rule 37(e)) based on Zesty Paws' failure to obtain the reports from Amazon and produce them to Nutramax. (Mot. at 4). The Court declines to do so, as Zesty Paws has not had an opportunity to be heard on the issue. Further, the Court understands the O'Neill declaration to take the position that these Amazon reports are not responsive because they do not show how many Amazon visitors interacted specifically with the #1 Claims on Zesty Paws' Amazon product pages. (O'Neill Decl. ¶ 6).

Obviously, Nutramax disagrees with that position, and it is not clear based on the current record who is right. If these reports are relevant and responsive and can still be requested from Amazon by Zesty Paws, the Court will entertain a motion to reopen discovery to allow Nutramax to obtain them. The parties should as an initial matter meet and confer to discuss this issue.

Compliance, the statement was intended "to list all of the potential sources we checked for usage of the #1 Claims," rather than "to confirm that the #1 Claims were used on all of the provided sources." (*Id.* ¶ 7). While that intent plainly could have been better expressed in the Notice of Compliance, the Court finds this explanation to be reasonable and credible.

Nutramax also argues that deposition testimony from Zesty Paws' Brian Cole revealed that he and his team "simply deleted the #1 Claims from customer presentations and wrote over those files," thereby spoliating presentations containing #1 Claims. (Mot. at 5). In his declaration, however, Cole explains that he and his team, in complying with the Preliminary Injunction Order, only removed the #1 Claims from retailer presentations going forward. (Cole Decl. ¶¶ 4-6). Cole has no reason to believe that any prior presentations containing the #1 Claims were deleted. (*Id.* ¶ 7). Such presentations are routinely circulated via both internal and external emails, and Zesty Paws has identified and produced to Nutramax numerous drafts and final versions of presentations that included the #1 Claims. (*Id.* ¶¶ 8-9; Bacon Decl. ¶ 5.c).

To be sure, Zesty Paws has conceded to having failed to preserve relevant and responsive evidence showing all uses of the #1 Claims, but Nutramax's contention regarding the scope of the spoliated evidence amounts to speculation, particularly in the context of Zesty Paws' voluminous production of evidence related to #1 Claims. If there were other significant locations where advertisements promoting the #1 Claims were placed, it is reasonable to assume that they would have been

21

referenced in the internal emails, sales presentations, and other documents produced by Zesty Paws and its marketing agency. Nutramax points to no such evidence.[5]

The Court cannot say it has a high degree of confidence there are no other instances of #1 Claims that were not preserved. Nutramax notes that Zesty Paws has not admitted to any lost #1 Claims beyond those that Nutramax brought to its attention, which seems at least somewhat suspiciously convenient. (Rep. at 9-10). Moreover, Zesty Paws is only willing to say that it "believes" it has identified the entire universe of removed materials. (Opp. at 5; *see also* Bacon Decl. ¶ 14 (stating in passive voice that "it has been confirmed" that this is the universe)). Still, there is no evidence that there is more, and perhaps more importantly, there is no reason to believe that if there is more, there is a lot more, in terms of either quantity or quality (*e.g.*, a highly trafficked retail website akin to Amazon or Target).

---

[5] The circumstances here are thus distinguishable from those in cases such as *Drips Holdings, LLC v. Teledrip LLC*, No. 5:19-CV-02789-JRA, 2022 WL 3282676 (N.D. Ohio Apr. 5, 2022), *R&R adopted in part, rejected in part*, 2022 WL 4545233 (N.D. Ohio Sept. 29, 2022), relied upon by Nutramax for the proposition that the #1 Claims evidence that admittedly was not preserved suggests the existence of far more such unpreserved evidence. (Mot. at 15). In *Drips Holdings*, the spoliated evidence involved all of the defendants' Slack instant messaging conversations (defendants' primary means of conducting business) save for a "small sampling" of conversations evidenced via deposition testimony or preserved via screenshots. 2022 WL 3282676, at *5-7. The court rejected defendants' argument that this small sampling was a "reasonable substitute" for the spoliated evidence and found it "reasonable to assume" that it represented just "the tip of the iceberg" of Slack conversations that would have reflected poorly on defendants. *Id.* at *6-7. Here, by contrast, the spoliated evidence consists of other examples of the same advertisements that Nutramax already has, not instant messaging communications, each one of which may have unique (and uniquely incriminating) information. Moreover, as discussed above, there are other sources of information that would be expected to reveal where else these advertisements may have run, unlike in *Drips*, where there was no feasible way of reconstructing the lost content of the Slack conversations.

Accordingly, the Court considers the spoliated evidence to consist of the 26 identified instances of website advertisements, social media posts, and other images of the # Claims that Zesty Paws removed without preserving.

### 2. Application of the Rule 37(e)(2) Test

#### a. Reasonable Steps to Preserve

"'The first element of the traditional spoliation test,' which is also applicable to ESI under Rule 37(e), 'requires the moving party to demonstrate that the spoliating party had an obligation to preserve the evidence at the time it was destroyed.'" *Doubleline*, 2021 WL 1191527, at *6 (quoting *Leidig v. Buzzfeed, Inc.*, No. 16 Civ. 542 (VM) (GWG), 2017 WL 6512353, at *8 (S.D.N.Y. Dec. 19, 2017)). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Limited v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

Zesty Paws acknowledges that this "dispute centers on" the #1 Claims. (Compl. ¶ 3). The removed #1 Claims are clearly responsive to Nutramax's February 2024 requests for production. What's more, Zesty Paws leadership had previously instructed all company employees to "preserve and not delete any materials that may be relevant to the dispute with Nutramax over the #1 Claims." (Alba Decl. ¶ 4; *see* Norton Decl. ¶ 11; Cole Decl. ¶ 4; O'Neill Decl. ¶ 4; Miller Decl. ¶ 8). Thus, at the time the #1 Claims were removed in June 2024, Zesty Paws plainly was aware of the relevance of the documentation of #1 Claims and its obligation to

preserve such documentation.  *See Arista Recs.*, 608 F. Supp. 2d at 433 ("Defendants [have] an obligation to preserve images of the webpages from their [publicly available] website, which Plaintiffs contend contained evidence [relevant to their claims].").

"Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take 'reasonable steps' to preserve it.  While that obligation runs first to the party, counsel is obligated to oversee compliance with a preservation notice, monitoring the party's efforts to retain and produce the relevant documents."  *Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377, 384 (S.D.N.Y. 2025) (citations omitted).  Here, although a preservation notice had been sent previously, it is unclear what, if any, preservation steps Zesty Paws' former counsel recommended in connection with complying with the Preliminary Injunction Order.  (*See* Rep. at 6).  Zesty Paws' current counsel suggested at the July 22 conference that it "likely would have done [things] differently in terms of the production and preservation."  (July 22 Tr. at 4:8-16).

"The 'reasonable steps' inquiry has been equated to 'roughly a negligence standard.'"  *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 61 (S.D.N.Y. 2020) (citation omitted).  Zesty Paws disputes Nutramax's assertion that it "made a *conscious* failure to take any reasonable steps to preserve relevant evidence" and suggests disagreement with Nutramax's assertion that Zesty Paws "apparently *did not take any precautions to prevent the destruction of this evidence*." (Opp. at 4 and n.1 (emphasis added by Zesty Paws)).  But at this step of the

analysis, a conscious failure to preserve need not be shown.  And if Zesty Paws took any precautions to preserve evidence while complying with the Preliminary Injunction Order, those efforts are not described in any of the declarations submitted by Zesty Paws on this motion.  The Court thus has little difficulty in concluding that, at a minimum, Zesty Paws was negligent in failing to preserve evidence of the #1 Claims when complying with the Preliminary Injunction Order.

Finally, the fact that Zesty Paws was unable to subsequently retrieve the spoliated #1 Claims documentation when making its supplemental production (*see*, *e.g.*, Rosenberg Decl. Ex. 17) shows that such documentation could not be "restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).  As such, the first prong of the three-part inquiry is satisfied.

### b.  Prejudice to Nutramax

The parties do not dispute the relevance of #1 Claim evidence or the fact that it was responsive to Nutramax's initial requests for production.  Still, "[i]t is not enough for the innocent party to show that the destroyed evidence would have been responsive to a document request. The innocent party must also show that the evidence would have been helpful in proving its claims or defenses—*i.e.*, that the innocent party is prejudiced without that evidence.  Proof of relevance does not necessarily equal proof of prejudice." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010).  "The Advisory Committee Note to Rule 37(e) explains that an 'evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in

the litigation.'" *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 178 (S.D.N.Y. 2022) (citation omitted).  Thus, courts in this Circuit "generally require that the lost evidence was not only probative, but also would affirmatively support the movant's claim to find prejudice."  *Id.*

Nutramax argues that Zesty Paws' spoliation prejudices its case by: (1) "destroying evidence of the actionable conduct, [making] it impossible for the trier of fact to know the full extent of Zesty Paws' violations;" (2) prohibiting Nutramax's experts from assessing the extent of the damages and the reliability of the reports produced by Nutramax's damages expert, Blake Inglish (*see* Stec Decl. ¶ 12, 15-17); and (3) preventing Nutramax from fully establishing the materiality and exceptionality of the #1 Claims, as required under the Lanham Act, 15 U.S.C. §1117(a).  (Mot. at 11-16).

Zesty Paws argues that the #1 Claim evidence which was destroyed bears "no material value to Nutramax's substantive case in light of the materials Nutramax already has and that Zesty Paws has produced."  (Opp. at 19).  In particular, Zesty Paws argues that the missing #1 Claims do not impair Nutramax's ability to prove the elements necessary to establish liability on its Lanham Act and other claims. (*Id.* at 18-19).  Further, Zesty Paws argues that there is no prejudice to Nutramax's damages case and that Nutramax's assertions to the contrary are based on the incorrect premise that Zesty Paws spoliated engagement data and customer metrics.  (*Id.* at 19-22).

Zesty Paws has the better of this argument.  Nutramax's claim that it has been prevented from proving "the full extent" of Zesty Paws' violations (Mot. at 12-14) is not true in any meaningful sense.  Nutramax will be able to prove where Zesty Paws promoted the #1 Claims, even with respect to the removed materials. With respect to the material removed from the Amazon and Target websites, Zesty Paws has agreed to stipulate that the #1 Claims were displayed on every Zesty Paws Amazon and Target product page from July 2023 to June 2024.  (Opp. at 23).[6] And with respect to the material removed from Zesty Paws' social media sites, Nutramax preserved copies of these materials itself before they were removed, and Zesty Paws has agreed to stipulate to the authenticity of Nutramax's copies.  (*Id.*). "The absence of prejudice can be shown by demonstrating that the other parties were able to obtain the same evidence from another source[.]"  *Best Payphones, Inc. v. City of New York*, No. 1 Civ. 3924 (JG) (VMS), 2016 WL 792396, at *6 (E.D.N.Y. Feb. 26, 2016) (cleaned up), *aff'd as modified sub nom. Best Payphones, Inc. v. Dobrin*, 409 F. Supp. 3d 130 (E.D.N.Y. 2018).

It is true that, at least in some cases, Nutramax does not have actual images of the #1 Claims as they appeared on particular sites.  But Zesty Paws represents that it has produced all images and media containing the #1 Claims that were used in its advertising campaign.  (*See* Opp. at 6-7; Dkt. No. 245 at 3).  Nothing in the record suggests, nor does Nutramax claim, that the advertisements that ran on the Amazon and Target product pages were unique or that Nutramax would be

---

[6] In addition, through its own efforts, Nutramax was able to preserve some Amazon product pages showing #1 Claims.  (Bacon Decl. ¶ 15; Rosenberg Decl. Exs. 9-11, 36-37).

prejudiced by not having the actual ads as they appeared on those sites when it is in possession of the functional equivalent. *See Rhoda v. Rhoda*, No. 14 Civ. 6740 (CM), 2017 WL 4712419, at *4 (S.D.N.Y. Oct. 3, 2017) (finding no prejudice where plaintiff had "already produced over 30,000 pages of emails" providing evidence similar in character to those it purportedly spoliated).

Under these circumstances, the Court perceives no impediment to Nutramax's ability to prove the elements of falsity, materiality, or exceptionality on its substantive claims. (*See* Opp. at 18-19). Despite Nutramax's rhetorical insistence that Zesty Paws has "spoliated *the* actionable misrepresentations in this case" (Mot. at 12; Rep. at 9 (emphasis in original)), Nutramax knows full well, and can prove, the content of those alleged misrepresentations and where they were made. Its argument that the loss of the physical copies of the ads as they appeared on certain websites is "intrinsically" prejudicial (Rep. at 9) not only lacks merit, but tacitly speaks to its inability to show *actual* prejudice.[7] *See Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 750 (S.D.N.Y. 2011) (where movant failed to explain why proof of each of certain incremental changes "would have

---

[7] Nutramax cites *Nutrition Distribution LLC v. PEP Research, LLC*, No. 16CV2328-WQH-BLM, 2018 WL 6323082 (S.D. Cal. Dec. 4, 2018), for the proposition that "spoliating the advertisements in a false advertising case is intrinsically prejudicial." (Rep. at 9). But in *Nutrition Distribution*, the defendant deleted all its social media posts promoting its products after the litigation began. *Id.* at *1. Although the plaintiff had preserved certain Facebook and Twitter posts during its pre-lawsuit investigation, it does not appear that those posts represented the entirety of the defendant's statements on social media about the products in question. *See id.* at *5 (noting that deletion of the social media posts "impairs Plaintiff's ability to establish the false advertising claim"). (Even so, the sanction imposed by the court was limited to an instruction to the jury noting that the defendants failed to preserve the social media posts and permitting (but not requiring) the jury to infer that the deleted posts were favorable to plaintiff and unfavorable to defendants. *Id.* at *6.).

allowed it to show infringement in a way that is at all materially different from the proof already available to it," the "claim for spoliation sanctions must fail").

Similarly, Nutramax suggests that, without the removed materials, it will be unable to show that Zesty Paws engaged in an "aggressive marketing strategy" (which could support materiality) or that Zesty Paws' conduct was "far-reaching" (which could help show exceptionality). (Rep. at 9). This argument is no more persuasive. Nutramax will be able to show the full scale and "aggressive[ness]" of Zesty Paws' marketing campaign concerning the #1 Claims based on the thousands of other documents produced, such as internal emails, sales presentations, communications with retailers, engagement data, marketing agency documents, and other records that have been produced. (*See* Bacon Decl. ¶¶ 5, 7).

As for damages, the Court likewise fails to understand how loss of the images of #1 Claims advertisements on certain websites or social media platforms would prejudice Nutramax's claims. Indeed, Nutramax's damages expert, Dr. Stec, does not appear to contend that it would. Rather, Dr. Stec—befitting a damages expert—focuses on the alleged loss of *data* relating to consumer views and clicks and the like. (*See* Stec Decl. ¶¶ 3, 8, 20). As explained above, however, the Court does not find that any such engagement data or customer metrics were spoliated. Nor does Stec explain, in either of his declarations, how the loss of the spoliated website advertisements and social media posts would affect his damages analysis (or his ability to critique the Zesty Paws damages expert's analysis) given Zesty

29

Paws' willingness to stipulate to those uses of the #1 Claims.[8]  Hence, Nutramax has not adequately shown that the spoliated evidence will cause prejudice to its damages case.

Although Zesty Paws had a clearcut obligation to preserve #1 Claims documentation, the loss of this evidence has not prejudiced Nutramax considering the breadth of evidence otherwise available to it and Zesty Paws' stipulations. Absent "proof that some information of significance has actually been lost," *Orbit One Commn's*, 271 F.R.D. at 431, Nutramax's requested remedy is unwarranted. *See Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, No. 15 Civ. 2926 (DRH) (SIL), 2019 WL 5694256, at *12 (E.D.N.Y. July 22, 2019) ("Although Plaintiff's conduct is far from model preservation of ESI, it is not liable for spoliation sanctions, much less a sanction as severe as an adverse inference, because Defendants have failed to show that the lost information was important or how they are prejudiced by such loss."), *R&R adopted*, 2020 WL 1242616 (E.D.N.Y. Mar. 16, 2020); *Ruzhinskaya v. HealthPort Techs., LLC*, 14 Civ. 2921 (PAE), 2015 WL 7308662, at *5 (S.D.N.Y. Nov. 19, 2015) ("The Court accordingly rejects [the defendant's] bid for an adverse inference instruction, because the records that [were] spoliated are, ultimately, immaterial to this litigation.").

---

[8] For example, Stec states: "If additional evidence existed that Zesty Paws had promoted the #1 Claims on more, or all, of its Amazon product pages, this would indicate a higher prevalence of these claims at Zesty Paws' largest customer than previously understood." (Stec Decl. ¶ 11).  But Zesty Paws has agreed to provide Nutramax with precisely that evidence, in the form of a stipulation that "the #1 Claims were displayed on every Zesty Paws Amazon . . .  product page from July 2023 to June 2024." (Opp. at 23).

### c. Intent to Deprive

"The intent to deprive standard is 'both stringent and specific,' and contemplates 'not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence.'" *Hoffer*, 128 F.4th at 440 (quoting *Karsch*, 2019 WL 2708125, at *21). "Proving such specific intent is not easy and frequently depends upon circumstantial evidence." *Id.* Factors considered in determining whether a party acted with the intent to deprive include:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*In re Keurig*, 341 F.R.D. at 496 (citation omitted).

Although Zesty Paws' intent to deprive may be shown by circumstantial evidence, the circumstances here do not suggest such intent. It is undisputed that the relevant evidence was lost in the context of Zesty Paws' compliance with Judge Schofield's June 4, 2024 Preliminary Injunction Order, which required Zesty Paws to cease all use of the # 1 Claims in the United States. (Dkt. No. 135 at 15). Zesty Paws had a relatively short time frame of two weeks to fulfill that court-ordered mandate. (*Id.* at 16). It is also undisputed that the lost evidence consisted of publicly available advertisements and social media posts. Spoliated evidence typically consists of emails or other internal or private communications whose existence is not known to—and as a result of the deletion will never be known to—

31

the party's adversary.  Here, Zesty Paws' #1 Brand advertising campaign was not a secret and the advertisements that were lost were not unique.  In that context, it is difficult to see how Zesty Paws could have rationally hoped to conceal the existence of the deleted material from Nutramax.

Moreover, it is difficult to construct (nor does Nutramax offer) a plausible reason *why* Zesty Paws would want to deprive Nutramax of the removed materials, particularly given the wealth of evidence of #1 Claims that was not destroyed, but preserved and produced.  As discussed above, the removed materials do not materially impair Nutramax's ability to prove its claims or its damages.  That fact not only cuts against any showing of prejudice to Nutramax; it also undermines any reasonable inference of malevolent intent on the part of Zesty Paws.  It is unlikely that Zesty Paws would have intentionally deprived Nutramax of the ability to use evidence that would not have materially assisted Nutramax in proving its case.

Zesty Paws' witnesses have sworn that, in removing these materials as required by the Preliminary Injunction Order, they did not act for the purpose of depriving Nutramax of any evidence.  (*See* Alba Decl. ¶ 10; Norton Decl. ¶ 13; Cole Decl. ¶ 11; O'Neill Decl. ¶ 10; Miller Decl. ¶ 9).  Under the circumstances described above, those sworn denials are credible.  They, and the record as a whole, suggest that Zesty Paws personnel were focused on the task of removing the #1 Claims to comply with the Preliminary Injunction Order and simply neglected to pay attention to their obligation to preserve evidence.  That is a far more reasonable inference than the suggestion that Zesty Paws deliberately used the need to comply

32

with the Court's Order as an occasion to destroy evidence and gain a litigation advantage.

The parties are in agreement that case law addressing purported spoliation in the context of compliance with a court order is sparse. (Mot. at 9; Opp. at 13; *see* July 22 Tr. at 17:8-18). In *Int'l Bus. Machs. Corp. v. BGC Partners*, 2013 WL 1775373 (S.D.N.Y. Apr. 25, 2013) ("*IBM*"), however, the court faced an analogous situation. There, plaintiff IBM demanded that defendant BGC remove allegedly infringing software on BGC's computer systems, then sought spoliation sanctions based on BGC's failure to preserve this evidence of its alleged infringement. *Id.* at *1-2. The court denied the sanctions motion, noting that IBM was "requesting that BGC be sanctioned for the same destruction of evidence that IBM commanded." *Id.* at *2. So too here, the destruction of the evidence resulted from the Preliminary Injunction Order issued at Nutramax's behest. It would be inappropriate to sanction Zesty Paws for complying with this Order in the absence of any showing that Zesty Paws, in doing so, simultaneously intended to deprive Nutramax of evidence.[9]

Nutramax cites *Drips Holdings*, *supra*, in which the court rejected the defendants' claim that it deleted Slack messages to minimize potential liability

---

[9] Nutramax attempts to distinguish *IBM* on the ground that IBM instructed BGC to "destroy" the software, *see id.* at *2, whereas here Nutramax asked Zesty Paws to "cease" further use of the #1 Claims. (Rep. at 5). This is not much of a distinction, since the action demanded in both cases was removal of the problematic ESI under circumstances where the alleged spoliator was under a duty to preserve the evidence. *See IBM*, 2013 WL 1775373, at *2 (noting that litigation was reasonably foreseeable when IBM made its demand and that, accordingly, BGC "had an obligation to preserve evidence at that time," yet instead "destroyed direct evidence of its alleged infringement").

under the California Consumer Privacy Act and the International Standard of Operation Compliance.  (Mot. at 9-10; *see also supra* n.5).  But the *Drips* court specifically found the defendants' claim "not credible" in light of, *inter alia*, the suspicious timing of the deletion.  *Drips Holdings*, 2022 WL 4545233 at \*4.  Further, the cited laws at issue did *not* require the deletion of data and the court found that defendants' change in policy "was not an innocent change of policy to comply with [the laws'] requirements."  *Id.* Here, there is no dispute that Zesty Paws' removal of the #1 Claims came in direct response to a court order requiring it to take those actions.[10]

Nutramax also argues that Zesty Paws' conduct *after* removing the #1 Claims suggests that it acted in bad faith at the time it removed the #1 Claims.  (Mot. at 17-21).  This argument fails to persuade.

First, Nutramax points to deposition testimony given by Zesty Paws' Rule 30(b)(6) witnesses, Claudia Hartel and Ryan Norton, who claimed, inaccurately, that the #1 Claims had not appeared on Zesty Paws' Amazon product pages, on YouTube, or at certain retailers like Walmart and PetSmart.  (Mot. at 18).  Nutramax suggests that Zesty Paws "leveraged" the spoliated evidence to allow

---

[10] The other cases cited by Nutramax rejecting arguments of good faith are also inapposite.  (*See* Mot. at 10).  In *Ahamed v. 563 Manhattan Inc.*, No. 19 Civ. 6388 (EK) (CLP), 2024 WL 3061962 (E.D.N.Y. June 17, 2024), the defendant "consciously acted with complete and utter disregard for his obligation to preserve relevant evidence."  *Id.* at \*5.  In *Google LLC v. Starovikov*, No. 21 Civ. 10260 (DLC), 2022 WL 16948296 (S.D.N.Y. Nov. 15, 2022), the defendants' claim of good faith turned on their assertion that they were unaware of the lawsuit at the time of the alleged spoliation, which the court found to be false and part of a "course of conduct" that "evince[d] a deliberate attempt to deceive [plaintiff] and the Court, and to avoid their discovery obligations."  *Id.* at \*8.

34

these deponents to conceal the scope of #1 Claim usage.  (Mot. at 17-18).  But that suggestion does not withstand scrutiny.

At the time of the Hartel deposition, Nutramax already knew—and Zesty Paws knew that Nutrmax knew—that the #1 Claims had appeared on Amazon product pages.  The Notice of Compliance, filed on June 18, 2024, stated that Zesty Paws had removed the #1 Claims from, *inter alia*, "Zesty Paws' Amazon store and product pages." (Dkt. No. 137 at 20).  And a week later, Nutramax informed Zesty Paws it was aware of #1 Claims still appearing on Zesty Paws' Amazon product pages (and other places) and asked for them to be removed.  (Jakopchek Decl. Ex. B).  Similarly, as Zesty Paws points out, Nutramax was able to refresh Norton's memory with documents Zesty Paws itself had already produced, and thereafter Zesty Paws helped Nutramax identify uses of the #1 Claims at Walmart and other retailers.  (Opp. at 16).  There is, accordingly, no basis for a finding that Zesty Paws was attempting through the witnesses' testimony to conceal its uses of the #1 Claims or its prior deletion of those Claims.  Rather, it appears that the witnesses were simply mistaken (and perhaps poorly prepared).

Nutramax next points to the expert report produced by Blake Inglish, Zesty Paws' damages expert, which Nutramax contends minimizes the usage of #1 Claims and even relies on Norton's and Hartel's incorrect deposition testimony.  (Mot. at 19).  Zesty Paws contends that Inglish "did not factor any use of or engagement related to the #1 Claims whatsoever into his damage model." (Opp. at 21).  Regardless, Inglish's report is dated March 7, 2025.  (Jakopchek Decl. Ex. U).  This

35

was after Zesty Paws had acknowledged in its January 17, 2025 letter that it had

not produced uses of the #1 Claim that it had removed in complying with the

Preliminary Injunction Order (Dkt. No. 245 at 3), and also after Norton's and

Hartel's deposition testimony had been shown to be incorrect.  Whether or not

Inglish's report has flaws related to Zesty Paws' usage of the #1 Claims (if it does,

Nutramax can exploit that in cross-examination), it does not support an inference

that Zesty Paws acted with the intent to deprive Nutramax of evidence concerning

the #1 Claims.

Finally, Nutramax points to Zesty Paws' letters and statements to the Court,

beginning with the January 17, 2025 letter, as evidence that Zesty Paws "spent

months trying to keep [its spoliation] from coming to light," instead of "coming

forward voluntarily to admit that it had spoliated evidence."  (Mot. at 20).  But the

statements Nutramax quotes involve Zesty Paws denying that it had withheld

documents or failed to comply with its document production obligations, not

statements about whether it had complied with its preservation obligations.  (*See

id.* at 20-21).  And as noted, the January 17 letter *disclosed* that Zesty Paws was

unable to produce certain #1 Claims because it had removed them in compliance

with the Preliminary Injunction Order.  (Dkt. No. 245 at 3).

The Court agrees that Zesty Paws could have and should have been more

forthright, even before Nutramax sought court intervention on January 14, 2025, in

acknowledging that it had failed to preserve #1 Claims.  But if what Zesty Paws was

less than forthright about was a *mistake*, that does not help Nutramax on this

motion.  Sanctions under Rule 37(e)(2) require proof of spoliation committed with the *intent to deprive* one's adversary of evidence.  And as the Court has found, the record here does not support a finding of intentional, as opposed to mistaken, conduct by Zesty Paws.

In short, the Court finds that Nutramax's claim—that Zesty Paws intentionally failed to preserve evidence in an effort to limit the scope of #1 Claim usages for which it might be held to account—to be unsupported and implausible. The Court thus denies Nutramax's motion for sanctions under Fed. R. Civ. P. 37(e)(2).

### 3.  Attorneys' Fees and Costs

In a footnote, Nutramax requests, in the alternative, sanctions under Rule 37(e)(1) in the form of an award of attorneys' fees and costs incurred by Nutramax "in its investigation and litigating Zesty Paws' discovery abuses."  (Mot. at 23 n.7). The Court need not consider this argument because it is made only in a footnote and is entirely undeveloped.  *See, e.g.*, *AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 333 n.20 (S.D.N.Y. 2024) ("The Court need not consider arguments only cursorily raised in a footnote."); *F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) ("It is well settled ... that a court need not consider arguments relegated to footnotes[.]").

Even if the Court were to consider Nutramax's request for attorneys' fees and costs under Rule 37(e)(1), the request would be denied.  As an initial matter, Rule 37(e)(1) does not authorize the imposition of sanctions for litigating "discovery

abuses," the relief sought by Nutramax.  Rather, the scope of Rule 37(e) is limited to spoliation of ESI, and an award of attorneys' fees and costs is available under Rule 37(e)(1) only "to the extent reasonable to address any prejudice *caused by the spoliation*." *In re Keurig*, 341 F.R.D. at 498 (citation omitted; emphasis added). Nutramax's footnote request for attorneys' fees and costs under Rule 37(e)(1) does not specify what fees and costs were caused by the spoliation.

To the extent Nutramax's footnote can be read as seeking its attorney's fees and costs in connection with its motion for spoliation sanctions, the Court has found that Nutramax suffered no prejudice from Zesty Paws' alleged spoliation, that Zesty Paws did not act with the intent to deprive Nutramax of evidence, and that Nutramax is not entitled to sanctions under Rule 37(e)(2).  In fact, while the Court did not need to reach the issue of what remedy would be appropriate under Rule 37(e)(2), Nutramax's requested remedy—a mandatory presumption that *all* of Zesty Paws' sales from July 2023 to the present were the result of its #1 Claims—was wildly disproportionate and entirely inappropriate.[11]  The Court will not order Zesty Paws to pay attorneys' fees for defending against an unsuccessful motion seeking such a draconian sanction.

**B. Nutramax's Request for Attorney's Fees Under Rule 37(c)(1)**

Nutramax moves for sanctions under Fed. R. Civ. P. 37(c)(1) to "hold Zesty Paws accountable" for its untimely production of the 2,388 documents included in

---

[11] According to Zesty Paws, it sold hundreds of millions of dollars of products during this period. (Opp. at 22).  Even Nutramax's damages expert, Dr. Stec, calculates Nutramax's damages at only $8.1 million (without the benefit of the suggested "mandatory presumption").  (*Id.*).

its May 2, 2025 supplemental production, made more than five months after the close of fact discovery. (Mot. at 23-25; *see* Dkt. No. 218 at 2). Nutramax does not seek to preclude Zesty Paws from using any of these documents but instead seeks attorneys' fees and expenses incurred in "litigating this issue." (Mot. at 25).

As a threshold matter, Zesty Paws contends that this aspect of Nutramax's request for sanctions is procedurally improper as the Court limited this motion to the question of spoliation. (Opp. at 25). As Zesty Paws notes, at the July 22, 2025 conference, the Court invited full briefing "at least insofar as it relates to the alleged spoliation." (July 22 Tr. 3:13-16). The Court did not authorize briefing as to Nutramax's request for sanctions based on Zesty Paws' alleged withholding or late production of documents. Rather, the parties were to discuss a potential resolution of this issue involving Zesty Paws' making witnesses available to be deposed (or re-deposed) on the newly produced documents. (*See* July 22 Tr. 30:8-11 (Nutramax's counsel: "Your Honor, we're happy to discuss and take back with [Zesty Paws' counsel] and come up with a potential for additional depositions that we hope will resolve this between the parties.")).

Consistent with that understanding, when Nutramax provided the Court with the parties' proposed briefing schedule for the motion three days later, its letter noted that the briefing would be "limited to the allegations of spoliation and requested relief relating thereto." (Dkt. No. 306). Moreover, the parties thereafter did agree to two additional depositions of Zesty Paws witnesses, which took place in

39

September 2025.  (Mot. at 25 n.9; Opp. at 25 n.16).[12]  Yet when Nutramax filed its motion, it sought sanctions for Zesty Paws' purported withholding of documents anyway, without having sought or obtained the Court's permission to do so. Nutramax's motion offers no explanation of why it decided to unilaterally expand the scope of the briefing on this motion.  Nor does it offer such an explanation in its reply brief, despite Zesty Paws' having raised this issue in its opposition brief. Indeed, Nutramax's reply brief does not mention its request for sanctions under Rule 37(c)(1) at all.

Under these circumstances, the Court deems Nutramax's motion for sanctions, to the extent based on Zesty Paws' withholding of documents, to have been abandoned.  *See, e.g.*, *Sjunde AP-Fonden v. Gen. Elec. Co.*, 722 F. Supp. 3d 347, 351 n.1 (S.D.N.Y. 2024) (deeming argument abandoned where not addressed in reply brief); *Doe v. Indyke*, 465 F. Supp. 3d 452, 466 (S.D.N.Y. 2020) ("Defendants do not respond to this argument in reply, and the Court deems them to have abandoned the argument.").

The Court also rejects Nutramax's request for sanctions on the merits. Nutramax's request is predicated solely on Rule 37(c)(1).  Sanctions under Rule 37(c)(1) are available only for certain kinds of discovery violations—specifically, if there has been a violation of Rule 26(a) or Rule 26(e).  *See* Fed. R. Civ. P. 37(c)(1) (authorizing sanctions "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (c)").  Only Rule 26(e) is potentially relevant here.  Rule

---

[12] Zesty Paws states that Nutramax did not request any other depositions.  (Opp. at 25 n.16).

26(e) provides, *inter alia*, that a party "who has . . . responded to a request for production . . . must supplement or correct its disclosure or response: . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process."  Fed. R. Civ. P. 26(e)(1)(A).

Nutramax does not articulate a theory as to how Zesty Paws violated its duty to supplement its document production under Rule 26(e).  Rather, Nutramax claims that Zesty Paws' initial document production was deficient, and that the documents produced by Zesty Paws on May 2 should have been produced "over a year" earlier as part of Zesty Paws' initial production.  (Mot. at 24).  But Rule 26(e) is not the source of a party's duty to conduct a reasonable search and produce documents in response to a document request.  That duty exists under Rule 34.  *See Gugino v. City of Buffalo*, No. 21 Civ. 283V(F), 2021 WL 5239901, at *3 (W.D.N.Y. Nov. 10, 2021).  Rule 26(e)'s purview is limited to requiring a party to supplement its production when it "learns" that its earlier production was incomplete.  *See Gotlin v. Lederman*, No. 04-CV-3736, 2009 WL 2843380, at *3 (E.D.N.Y. 2009) ("The duty to supplement [under Rule 26(e)] . . . is triggered only where 'a party[,] or more frequently [its] lawyer, obtains actual knowledge that a prior response is incorrect.'" (quoting *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 433 (S.D.N.Y. 2004)).[13]

---

[13] The cases cited by Nutramax (Mot. at 24-25) are not to the contrary.  The court in *Au New Haven*, 2023 WL 2612204, imposed sanctions under Rule 37(c)(1) against a litigant who withheld responsive documents.  (*See* Mot. at 24).  But the documents in question were created *after* the litigant's initial document production.  Therefore, an underlying violation of Rule 26(e)'s duty to supplement existed.

Here, Zesty Paws learned of potential deficiencies in its document production when it received Nutramax's November 7, 2025 deficiency letter. (Opp. at 9-10; Jakopchek Decl. Ex. E ). But Zesty Paws did not ignore its duty to supplement its production after learning of that information. To the contrary, the record reflects that it engaged in extensive efforts over the next two months to investigate Nutramax's claims and identify requested materials. (Bacon Decl. ¶ 9). It also made supplemental productions during this period. (*Id.*). Zesty Paws asserts that it was about to make another supplemental production when Nutramax first sought court intervention on January 14, 2025. (Dkt. No. 245 at 2). At the discovery conference on March 18, 2025, Zesty Paws offered to continue to meet and confer with Nutramax to address other document production issues, and thereafter it did so, leading to its May 2 supplemental production. (March 18 Tr. at 30:13-22; Dkt. No. 289 at 1).

Therefore, the record indicates that Zesty Paws did not fail to supplement its document production as required under Rule 26(e) but *did* supplement its production after learning of potential deficiencies. As Nutramax has not shown (or even attempted to show) an underlying violation of Rule 26(e), there is no basis for an award of sanctions under Rule 37(c)(1). *See Williams v. City of New York*, No. 16 Civ. 4315 (JGK), 2017 WL 4382283, at *1 (S.D.N.Y. Sept. 29, 2017) (where movant did not make any allegations that adversary violated Rule 26(a) or (e), "his motion

---

*See Au New Haven*, 2023 WL 2612204, at *1. The other case cited by Nutramax, *Ryan v. Rock Grp., NY Corp.*, No. 18 Civ. 2600 (GHW), 2019 WL 6841874 (S.D.N.Y. Dec. 16, 2019), did not rely on Rule 26(e) or Rule 37(c)(1) at all.

for sanctions under Rule 37(c)(1) must be denied"); *Ward v. Nat'l Geographic Soc'y*,

No. 99 Civ. 12385 (LAK), 2002 WL 27777, at *2 (S.D.N.Y. Jan. 11, 2002) ("In short,

plaintiff has failed to show that Rule 37(c)(1) even applies to NGS's conduct.

Instead, plaintiff merely demonstrates that NGS failed to comply in a timely

manner with a request for production of documents under Rule 34.").[14]

To be sure, the problems with Zesty Paws' initial document production are

troubling.  The documents produced on May 2 are concededly responsive to

Nutramax's document requests and relevant to this case.  And the sheer volume of

the supplemental production, together with Nutramax's assertions that some of the

documents should have hit on Zesty Paws' original search terms, suggests some

manner of negligence in Zesty Paws' original production.  But these observations

regarding Zesty Paws' *initial production* do not provide grounds for sanctions under

Rule 37(c)(1) regarding its May 2 *supplemental production* which itself does not

stand in violation of Rule 26(e).

Finally, an award of sanctions under Rule 37(c)(1) lies within the discretion

of the court.  *Sportvision, Inc. v. MLB Advanced Media, LP*, No. 18 Civ. 3025 (PGG)

(VF), 2023 WL 6633556, at *2 (S.D.N.Y. Oct. 12, 2023) ("[C]ourts in this circuit have

recognized that the imposition of sanctions under Rule 37(c)(1) is a matter within

---

[14] Rule 26(e)(1)(A) requires a party to supplement its document production "in a timely manner" once it learns of the need to supplement.  Given Zesty Paws' continuing efforts to locate and produce additional documents after receiving Nutramax's November 7, 2025 deficiency letter, Nutramax's further specifications of the documents it claimed should have been produced (*e.g.*, in its letter following the March 18 conference), and the magnitude of the efforts involved, the Court does not find (and again, Nutramax does not argue) that Zesty Paws failed to supplement its production in a timely fashion.  Nor does the record support a finding that Zesty Paws intentionally withheld documents prior to November 7 that it knew were responsive and missing from its initial production.

the trial court's discretion" (citation omitted)).  Significantly, there is no indication that Zesty Paws seeks to make affirmative use of the late-produced documents as part of an effort to "sandbag" Nutramax—which is what Rule 37(c) is designed to guard against.  *See* *Feltenstein v. City of New Rochelle*, No. 14 Civ. 5434 (NSR), 2018 WL 3752874, at *6 (S.D.N.Y. Aug. 8, 2018) ("The fundamental purpose of Rule 37(c) is to prevent the practice of 'sandbagging' an adversary with new evidence."). Given all the circumstances here, including Zesty Paws' good faith efforts to address the problems in its document production identified by Nutramax, the Court finds, in its discretion, that even if Nutramax could properly seek an award of sanctions under Rule 37(c)(1), an award of sanctions is unwarranted.

## CONCLUSION

For the reasons stated herein, the Court **DENIES** Nutramax's motion for discovery sanctions under Rule 37(e) and Rule 37(c)(1).  The Clerk of Court is respectfully directed to close the pending motion at Docket No. 310.

**SO ORDERED.**

Dated:    New York, New York
          March 26, 2026

_____
GARY STEIN
United States Magistrate Judge

44